**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS ex rel., KENYA SIBLEY, | ) ) ) ) | |
| Plaintiffs-Relator, | ) ) | Case No. 13 C 7733 |
| v. | ) ) | Judge Jorge L. Alonso |
| | ) | Magistrate Judge Maria Valdez |
| A PLUS PHYSICIANS BILLING SERVICE, INC., et al., | ) ) ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

To:  Kathryn A. Kelly, AUSA
Dirksen Building
U.S. Atty's Office - Civil Division
219 South Dearborn St., 5th floor
Chicago, IL 60604

Barry A. Spevack, Esq.
Michael D. Monico, Esq.
Monico & Spevack
20 S. Clark St., Suite 700
Chicago, IL 60603

Scott D. Hammer, Esq.
Karen E. Bettcher, Esq.
Wilson Elser
55 West Monroe Street
Suite 3800
Chicago, IL 60603

Joseph Chervin, Esq.
Assistant Attorney General
Office of the IL Attorney General
100 W. Randolph St., 12th Fl.
Chicago, IL 60601

James Vincent Garvey, Esq.
Joshua A. Dunn, Esq.
Vedder Price P.C.
222 N. LaSalle, Ste. 2600
Chicago, IL 60601

**PLEASE TAKE NOTICE** that on 14th Day of September 2015, I filed with the United States District Court for the Northern District of Illinois, Eastern Division, **PLAINTIFF-RELATOR'S THIRD AMENDED COMPLAINT**, a true and correct copy of which is attached hereto and is hereby served upon you.

 /s/   Robin Potter
One of Relator's Attorneys

Robin Potter, Esq.
Robin Potter & Associates, P.C.
111 East Wacker Drive, Ste 2600
Chicago, IL 60601
(312) 861-1800
robin@potterlaw.org

Jefferey Ogden Katz
Michael Haeberle
The Patterson Law Firm, LLC
1 North LaSalle Street
Suite 2100
Chicago, Illinois 60602
(312) 750-1817
JKatz@pattersonlawfirm.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS ex rel., KENYA SIBLEY, | ) ) ) | |
| | ) | Case No. 13 C 7733 |
| Plaintiffs-Relator, | ) | |
| v. | ) | Judge Jorge Alonso |
| | ) | Magistrate Judge Maria Valdez |
| A PLUS PHYSICIANS BILLING SERVICE, INC., HANDRUP and ASSOCIATES. and ERIC SCHOEWE, LAURIE GENTILE, and THEODORE HANDRUP individually, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT**

Plaintiff-Relator Kenya Sibley ("Ms. Sibley," "Sibley" or "Relator"), by her undersigned attorneys, Robin Potter & Associates, P.C., and the Patterson Law Firm, for her Third Amended Complaint against Defendants A Plus Physicians Billing Service, Inc. ("A Plus"), A Plus owner Eric Schoewe ("Schoewe"), A Plus former manager Laurie Gentile ( "Gentile"), healthcare provider Theodore B. Handrup, M.D., LTD., and owner Theodore B. Handrup, M.D., (collectively, "Handrup")[1] on behalf of the United States of America, the State of Illinois and private carriers, states as follows:

**NATURE OF THE CASE**

1.     Kenya Sibley brings this action against Defendants  to recover damages and civil penalties on behalf of the United States of America, the State of Illinois and private carriers,

---

[1] Based on representations from Defendants Handrup, the above caption has been changed to correct misnomer. Plaintiff will seek court approval to formally amend the caption.

arising from kickbacks, false and/or fraudulent records, statements and claims made, used and caused to be made, or presented by Defendants and/or their agents, employees and co-conspirators in violation of the False Claims Act, 31 U.S.C. §3729 *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), P.L. 111-21(2009) and the Patient Protection and Affordable Care Act of 2010; the Illinois False Claims Act, 740 Ill. Comp. Stat.175/1 et seq. ("collectively, "the FCA") ; the Stark Law, 42 U.S.C. §§1395nn; the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b; and the Illinois Insurance Claims Fraud Prevention Act ("ICFPA"), 740 ILCS 92/15(a).

2.      From at least 2011, and continuing through the present, defendants have intentionally and knowingly submitted false and fraudulent claims and statements for payment to Medicare, Medicaid, other state and federal programs, and to private carriers. These false claims and statements arose from defendants' unlawful schemes and practices to collect higher reimbursements from public and private insurers. Defendants Handrup, A Plus's largest client, was aware of A Plus's submission of false claims and facilitated the continued submission of these claims, including through the payment of kickbacks and remuneration to A Plus.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C.§§ 3729, 3730, and 3732; 28 U.S.C. §1331; and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over defendants pursuant to 31 U.S.C. §3732(a) insofar as the Defendants can be found in, reside in, and transact or have transacted business within the Northern District of Illinois.

5.      Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. § 3732(a).  At all times relevant to this Complaint, defendants regularly conducted substantial business within this district and maintained employees and/or offices in this district. In addition, statutory violations, as alleged herein, occurred in this District.

6.      This action is not based on a public disclosure. It is based on information that is within the direct and independent knowledge of Kenya Sibley. Ms. Sibley has provided that information to the government prior to filing this action.

7.      On behalf of the government and private carriers, Ms. Sibley seeks to recover damages and civil penalties arising from defendants' unlawful billing practices and kickbacks paid to induce overpayments to both public and private insurers.

## PARTIES

8.      Ms. Sibley is a certified Medical Biller and has experience and training as a medical coder.  She resides in Illinois.  Between June 2011 and August 2012, Ms. Sibley was employed by the A Plus defendants as a medical biller.

9.      Defendant A Plus Physician's Billing Service, Inc. is a health care billing agency, incorporated in the State of Illinois.  It maintains its principal place of business at 4250 N. Marine Drive, Suite 236, Chicago, Illinois 60613.  A Plus submits claims for reimbursement to private and public insurance providers on behalf of its healthcare provider clients and in exchange, it charges a percentage of the money collected. A Plus advertises that it increases collections by 10-20%.  See Group Exhibit A, KS 7-8, A Plus website.

10.     Eric Schoewe, is the President of A Plus, which he co-owns with his brother.  He is the company President and is directly involved in the day-to-day operations of A Plus.

4

11.     Mr. Schoewe resides in Chicago, Illinois and is primarily responsible for running operations at A Plus, including the submission of claims for reimbursement to public and private insurers; payments to A Plus treater/clients; training staff on billing protocols and procedures and assigning doctors and/or bills to staff billers, which are then entered into A Plus computers and submitted to carriers for payment.

12.     Laurie Gentile was employed by defendant A Plus u as a manager until she retired in 2012. She was Ms. Sibley's direct supervisor.  Ms. Gentile currently resides in Arizona.

13.     Ms. Gentile also assisted Mr. Schoewe with the submission of claims for reimbursement from public and private payors and performed all the duties Mr. Schoewe performed, as set forth in paragraph 11, *supra*.

14.     Defendant Handrup owns and operates Handrup and Associates, a multi-disciplinary mental health practice with its principal place of business at 2800 North Sheridan Rd., Ste 502, Chicago, Illinois. Dr. Handrup is an Illinois resident.  See:

https://www.drhandrup.com/drh/

15.     At all relevant times, Handrup was a client of defendant A Plus.  As with other A Plus clients, Handrup and A Plus entered into a contract for billing services, commencing in 1993 and continuing through the present.  Under the contract, A Plus received as payment, at least 5% of all monies it collected on behalf of Handrup.

16.     A Plus' contract with Handrup was typical, and also provided that A Plus would generate and mail at least twice weekly, computerized HFCA 1500 billing forms (or successor forms) and provide billing accounting.

## CONTROLLING LAW & SOURCES OF PAYMENTS TO DEFENDANTS

13.     The FCA expressly prohibits each of the following acts:

- knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A) (2010)[2];
- knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B) (2010);
- knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the federal government, 31 U.S.C. § 3729(A)(1)(G) (2010);
- conspires to commit a violation of sub-paragraphs (A), (B), (D), € (F), or (G); conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government, 31 U.S.C. § 3729(A)(1)( C) (2010).

14.     The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  *Id.*

15.     Under the False Claims Act, a "claim" is defined as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property. 31 U.S.C. § 3729(b)(2)(A).

---

[2]     Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009, making certain amendments retroactive, including 31 U.S.C. § 3729 (a)(1)(B) and further amended by the Patient Protection and Affordable Care Act ("PPACA"), effective July 21, 2010, P.L. 111-203, Title X, Subtitle G, §1079A.

16.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), was enacted due to congressional concern that payoffs to those who can influence healthcare decisions, would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the integrity of government programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute effective 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  See Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. §1320a-7b, Medicare Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

17.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person from referring, recommending or arranging for federally–funded medical services, including services provided under the Medicare and Medicaid programs.  In pertinent part, the statute states:

(b) Illegal remuneration

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind

>> (A) in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . .

> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

7

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrators to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $10,000 – $50,000 per violation and three times the amount of remunerations paid. 42 U.S.C. § 1320a-7b(b) and 42 U.S.C. § 1320a-7a(a).

18.     The Stark law prohibits physicians from referring Medicare or Medicaid patients for services or care to entities with which the physicians have a financial relationship. 42 U.S.C. § 1395nn(a)(1).

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, which is known as "Medicare" or the "Medicare Program," to pay for certain medical services and care for the aged or disabled. See 42 U.S.C. §1395 to 1395ccc. Outpatient prescription drugs are covered under Medicare Parts A-D.

20.     In 1965, the federal government also Medicaid, a cooperative joint federal-state program to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the Secretary of the U.S. Department of Health and Human Services ("HHS"), through the Centers for Medicare and

8

Medicaid Services ("CMS"). 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §1396b(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation ("FFP"). The percentage of a state's Medicaid program paid for by the federal government is known as the Federal Medical Assistance Percentage ("FMAP"), and is different for each state. Outpatient prescription drugs are covered under the Medicaid Program as long as they meet the definition of a "Covered Outpatient Drug."

21.     The State of Illinois administers Medicaid through the Illinois Department of Healthcare and Family Services (DHFS).

22.     At all times relevant to this Complaint, the United States provided funds to the State of Illinois through the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq*. The FMAP for the State of Illinois, the percentage of Illinois Medicaid funds contributed by the federal government, is 50%.

23.     Enrolled providers of medical services to Medicaid recipients, including defendants, are eligible for and have in fact collected reimbursement for covered services submitted for payment under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

24.     As condition of participating in the Medicaid program, enrolled providers such as Dr. Handrup, agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to required records and information.

25.     As a condition of payment and to receive Medicaid funds, enrolled providers, such as Dr. Handrup, together with authorized agents, employees, and contractors such as defendants, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures issued by the State of Illinois.

26.     Illinois Medicaid reimburses health care providers for covered services. Illinois Medicaid determines what types of services are covered and therefore reimbursable, and at what rate the covered service will be reimbursed.

27.     Under the Social Security Act, Defendants may seek payment from the United States for providing "reasonable and necessary" health care services.  42 U.S.C. 1395y(a)(1).  As a condition of submitting claims for payment and receiving Government reimbursement or money, Defendants are required to insure that all services provided are medically necessary and are supported by documentation.  42 U.S.C. §1320c-5(a); 42 C.F.R. §466.71(d), 1004.10.

28.     To bill the government and private carriers, Defendants must actually render the services for which they bill.

29.     It is a violation of the FCA and the ICFPA to bill Medicare or private carriers for services or treatments that are not medically necessary or not performed. 31 USC § 3729.

30.     Health care providers and their billing agents, including Defendants, use Current Procedural Terminology ("CPT") and/or the International Classification of Diseases, Clinically modified  (ICD-9-CM or ICD-10) or a HCPCS coding system for billing governmental and private carriers. Provider billing must identify the patient services provided and the medical diagnoses justifying the services.

31.     CPT codes are required by private and governmental carriers. They are a uniform way to describe medical, surgical and diagnostic services provided to patients. The ICD-9-CM system is used in the United States primarily for statistical classification systems to report vital statistics, but is also used by Medicare to determine diagnosis related groups (DRG) for inpatient hospital reimbursements.

32.     The HCPCS system reflects services, procedures and supplies used in treating a patient and it includes three levels of codes and modifiers.  Level 1 contains the five digit code noted above. HCPCS Level II is an alphanumeric code that enhances the CPT with a modifier used by physicians and for non-physician services, such as for orthotics, ambulance, prosthetics. HPCS Level II codes are maintained and jointly used by CMS and the BlueCross and BlueShield and the Health Insurance Association of America. HPCS Level III (local assignment) are codes used for services by individual contractors to process Medicare claims. Local codes begin with series WY and Z, followed by 4 digits. See CPT Codes, Group Exh. A, Bates KS 95, 161-62

33.      Defendants Handrup utilized various CPT codes in his "superbill" sent to A Plus. See Group Exh. A, Bates 95, 161. The documents in the superbill and patient record must support the billing and code.  Absent documentation, the provider is not entitled to be paid, and the submission is a false claim subject to repayment. *A Guide to Auditing Health Care Billing Practices*, Second Edition, Edford, Georgeann, MBA, RN, CCS-P;  (Atlantic Info Services, Inc. (2001).

34.     Relator submits hereto multiple examples of false billing by defendants, including blank billing sheets tendered by Defendant Handrup to Defendant A-Plus, which were in turn,

completed by APlus' additions of procedure codes, and for the purpose of maximizing reimbursements.  See, Group Exh. A, Bates KS 53-62, 94, 95, 161-62

35.     As set forth above, defendants have made claims for payment pursuant to the express language of the FCA and the statutory definition of "claim." Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA. See, *United States ex rel. Tyson v. Amerigroup Illinois, Inc.,* 2005 U.S. Dist. LEXIS 24032, 2005 WL 2667207 at *3 (N.D. Ill. 2005); *U.S. v. Ortho-McNeil Pharmaceutical, Inc.,* 2007 U.S. Dist. LEXIS 52666, 2007 WL 2091185 at *2 (N.D. Ill. 2007).

36.     The ICFPA provides that any interested person may bring a civil action on behalf of themselves and the State of Illinois. 740 ILCS 92/15(a).

37.     Pursuant to 720 ILCS § 5/46-1 of the Illinois Criminal Code, a person commits the offense of insurance fraud when he or she:

> [K]nowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company. . .

720 ILCS 5/17-10.5.

38.     From 2010 to at least 2012 and continuing through the present, each time a patient was treated by defendants Handrup, A Plus and Handrup submitted or caused to be submitted a certification to private or governmental carriers stating that the medical services rendered to the patient were provided in accordance with state and federal law, and requested to be reimbursed for those services.  Such certifications constitute claims under the False Claims Acts.

12

## DEFENDANTS' FRAUD SCHEMES

**A.      Methods of Billing**

39.      At all times relevant herein, A Plus  operated a health care billing agency, acting as a contractor to submit claims on behalf of health care providers to public and private insurers.

40.      At all relevant times, A Plus had approximately 15 employees , most of whom were responsible for creating claim forms to be submitted on behalf of the provider-clients of defendants A Plus to carriers.

41.      A few times per week, Defendant Schoewe would pick up or receive billing forms from Defendants Handrup and/or other clients.  See, e.g., Group Exh. A, Bates 53-63, 160-61. The attached samples are blank in terms of procedures or codes, and were completed by the A Plus defendants.

42.      Schoewe would then review and organize the documents, and assign the original billing forms to designated billers who were responsible for entering the billing codes into A Plus computers, for submission to government and private carriers. See Exh. D, KS 100-02.  For example, Defendants Schoewe and Gentile were responsible for different treaters.  Defendant Gentile was the person who handled the Handrup account. *Id*.

43.      Defendants Gentile and Schoewe would pick up the completed billing forms from their billers, including Plaintiff Sibley, and submit the claim forms to a third party clearing house, MD Online, a New Jersey-based company. In turn, MD Online then electronically submits defendants' claims directly to the insurance providers.

44.     From at least 2011 and continuing through present A Plus generated millions of dollars in revenue for defendants by knowingly and intentionally submitting fraudulent claims for reimbursement from public and private insurers.

45.     Defendants' fraudulent schemes include (1) "upcoding," i.e., the practice of inflating bills by using diagnosis codes, treatments and places of service applicable to more expensive treatments,  services and locations than actually provided, (2) for psychiatric providers such as the Handrup defendants, billing "default" codes, irrespective of and without documentation as to what procedures and treatments were actually provided to patients and, (3) payment or accepting kickbacks in exchange for the submission of false claims.

46.     For psychiatric providers such as the Handrup defendants, after the initial patient visit, the superbill coding was often "blank" and completed by A Plus, based upon an assumed and routinized treatment or "default" billing or use of a CPT code that was designed to obtain maximum reimbursement.   For example, defendants Gentile and Schoewe instructed billers, including Ms. Sibley, to change points of service (Group Exh. A, Bates KS 89), to complete blank superbills (Bates KS 67, 160-61) and to alter the names of the providers or therapists (Bates KS 91, 95).

47.     In exchange for billing governmental and private carriers, A Plus receives a percentage of the total accounts receivable for each physician group. See Group Exh. A, KS 7.

48.     A Plus generates increased revenue for itself by increasing the revenue collected on behalf of the physician groups.

49.     During the period between May 2010 and August 2011, A Plus maintained at least 40 clients for which it provided billing services.

14

50.     In practice, A Plus allowed healthcare professional groups, including defendants Handrup, to submit a list of patients and dates of service, without detailing the services provided, or the location of the medical code to be billed.  See e.g., Group Exh. A, Bates 160-61, a blank superbill. A Plus frequently billed based upon a "default" or contrived code, but lacking documentation to support the billing. A Plus allegedly maintained a listing of the initial plan of care for patients, and mechanically inserted those billing codes into future bills, albeit without any supporting documentation. In some instances, documentation from the healthcare professional groups lacked even the dates of service.

51.     Schoewe personally submitted a majority of A Plus' claims including those claims which Sibley told him were fraudulent.  See e.g., Exh. D, Bates 97, 100-02.

**B.      Defendants Schoewe and Gentile's ordered Sibley to bill illegally**

52.     Both defendants Schoewe and Gentile practiced "default" billing at A Plus, by ordering employees to create billing information and alter bills for submission of payment.

53.     Gentile trained Sibley in this "default" billing at A Plus and both defendants Gentile and Schoewe trained other billers, including as Jacqueline Pasarelli and Maria Robles Vera.

54.     Within a month of her hire in September 2011, Sibley complained to defendant Gentile that some of A Plus' billing practices were illegal.  Gentile denied and explained that the practices were designed to obtain maximum reimbursement from carriers.

55.     Sibley also reported the illegal billing to her temp recruiter Ryan Palmer, and requested to be assigned to a different workplace. Mr. Palmer did not have an available replacement position, and said he would speak with Gentile and Schoewe.

15

56.     The following day after Sibley's conversation with Palmer, Schoewe and Gentile summoned Sibley into Schoewe's office to discuss her concerns.  Gentile repeated that the billing was not illegal, but rather, that A Plus was maximizing reimbursement by "manipulating" the coding.

57.     Sibley continued to complain to both Gentile and Schoewe over several months until Gentile's retirement announcement in February of 2012,  including that she could not legally bill blank "superbills" or change billing coding to allow for reimbursements to be approved or increased.  Instead Gentile continued to bill the incomplete or altered bills from defendant Handrup that Sibley refused to process until her retirement.  See e.g., Group Exh. A, Bates KS 95.

58.     In February or March 2012, Ms. Sibley was called into a meeting with Gentile, Schoewe, Dr. Theodore Handrup and his wife Cythnia Handrup to discuss the transitioning of the Handrup account from Gentile to Ms. Sibley's control.

59.     At that meeting, the Handrup defendants sought assurances that the same methods of blank superbilling, alterations to the provider identity and other frauds would continue in the same fashion as Ms. Gentile had billed.  Specifically, Dr. Handrup requested that Sibley avoid raising any "red flags" from Medicare.

60.     Immediately after this meeting Ms. Sibley went into Schoewe's office, asked to speak with him about the billing practices and said she would not bill illegally. Schoewe asked Ms. Sibley for evidence of the frauds which she had been complaining about.

61.     The next morning, Sibley presented Schoewe with the evidence of the frauds compiled in a stack of documents. Defendant Schoewe told Ms. Sibley to keep billing the same

way, and in the meantime, he would reach out to Handrup's physicians to request that they provide additional documentation.

62.     Continuing after Gentile's retirement, Ms. Sibley began stacking incomplete bills on her desk and refusing to bill them, until the required information was provided. Schoewe summoned Sibley to his office to explain the backlog. Schoewe explained that he could not risk losing the Handrup account and again requested that Sibley fill in blank superbills. Sibley refused and said she would not be held criminally responsible for illegal billing. Schoewe told Sibley to keep "working with" him.

63.     In June 2012 Sibley received a stack of incomplete bills from Dr. Sandhu, an employee of Defendant Handrup.  Sibley faxed the bills back to Dr. Sandhu indicating that she could not fill in blank bills and requested that he fill out the superbill completely.  Instead Dr. Sandhu replied with a fax, on June 5, 2012 that Ms. Sibley had his permission to fill out the bills on his behalf and that she should "use appropriate codes as necessary for each patient servicing". *See* Sandhu's response at Group Exh. A, KS 67.

64.     Within a few weeks after the Sandhu incident, Schoewe requested another meeting with Sibley.  In that meeting, Schoewe asked Sibley not to use the word "illegal" in her communications because he was concerned about how it would affect A Plus' relationship with Handrup.

65.     On June 21, 2012 Sibley wrote an email to Dale Schroeder, an employee of Handrup about the blank superbills and copied Schoewe.  In the email Sibley stated to Schroeder that although Gentile had been making changes on the superbills she was "not willing to make that change because it is simply ILLEGAL [sic] to do so!"  Exh. B, Sibley Prod. 293.

66.     In that email, Sibley noted to Dale that "Eric asked me to make the change on the superbill if your providers don't fill them out correctly and again i'm [sic] also not willing to do that just like your [sic] not.  It's Illegal…….. [sic]" Exh. B, SIBLEY PL PROD 293, (emphasis in original).  Further Sibley wrote, "I have talked to Eric (My Boss) about educating the doctors and the therapist on how to properly complete the superbills and to go over billing, coding, and all other billing related issues." Exh. B, SIBLEY PL PROD 293.

67.     Sibley continued, "I also can't and i'm [sic] not willing to change the providers on the superbills for the doctors or the therapist.  If i [sic] receive a superbill and it has that Cynthia [Handrup] seen the patient, that's who i'm [sic] going to bill it under not any other provider. That's also illegal." Exh. B, SILBEY PL PROD 293.  Sibley was referring to repeated requests that she change the provider from Cynthia Handrup to a provider that would be covered by a patient's insurer.  *See infra*.  Sibley concluded by stating that "I have already been discussing these same issues with Laurie [Gentile] and Eric [Schoewe] for a couple of months now." *Id.*

68.     After sending June 21, 2012 email, Sibley asked Schoewe if he was planning on responding to it.  Schoewe responded to Sibley that he was not planning on responding by email because he didn't want to create "a paper trail", especially when Sibley was using the word 'illegal' in her emails.

69.     From 2011 through 2012, Ms. Sibley witnessed hundreds of false claims submitted by defendants Gentile and Schoewe to governmental and private carriers.

70.     As a medical biller, Ms. Sibley was tasked by A Plus with submitting claims for reimbursement of services based on contrived documents or superbills provided by health care providers. In particular, Ms. Sibley drafted claims on behalf of Handrup & Associates (Chicago),

Dr. Hubert Dolezal (Chicago) and Savage & Taylor Psychological Services Medical, P.C. (Chicago).

71.     Based upon Ms. Sibley's review of billing records and subject to verification generated about - $150,000 per month in reimbursements as a result of A Plus' billing.

**Upcoding**

72.     Defendants engaged in fraudulent "upcoding" of claims for the purpose of artificially inflating revenue generated from reimbursements on behalf of their clients and for themselves.

73.     A Plus engaged in upcoding by submitting claims using CPT codes that would provide the highest reimbursement based on the insurance provider, rather than the CPT codes that properly reflected the services provided.

74.     Defendants' fraudulent upcoding has resulted in millions of dollars of overpayments to various healthcare providers for services that were not rendered as billed.

75.     Based on her experience, Ms. Sibley determined that defendants routinely altered CPT codes to reflect services that were not actually provided, in order to ensure the maximum reimbursement from insurers.

76.     In particular, claims submitted for reimbursement from Medicare of Medicaid were routinely altered.

77.     Ms. Sibley did not receive formal training on how to submit claims for reimbursement on behalf of physician groups. Instead, she was trained on the job by her supervisors, Defendants Gentile and Schoewe.

78.     A Plus's billers, including Ms. Sibley, were required to input information provided on Superbills from physician groups into a computer program called "4-C".

79.     4-C allows users to enter information for each healthcare provider and the services provided to each patient by inputting the data into an interactive form.

80.     The on-line interactive form requires the biller to input the CPT code corresponding with the service provided, the code designated for the healthcare provider and the location at which services were provided.

81.     The 4-C program then allows the user to generate a claims for on any one of several official forms, including the  HCFA 1500 (hospital visits).  These claims forms are then sent to A-Plus' billing vendor MD Online for submission to the appropriate insurer.

82.     Reimbursement rates are determined based on the service provided as designated by the CPT code, provider and Place of Service ("POS").

83.     For example, an initial psychiatric diagnostic evaluation provided pursuant to CPT code 90801, was reimbursed at a rate of $127.76 when provided at a healthcare facility and $162.11 when provided elsewhere.[3]

84.     Further, different CPT codes result in different reimbursement rates.  For example, CPT code 90805, which indicates a psychiatric office visit lasting 20 to 30 minutes with evaluation and management services provided[4], is reimbursed at a rate of $87.46 when provided in a non-facility.  Alternatively, CPT code 90816, which indicates inpatient medical

---

[3]     Psychiatric CPT Codes have been changed for 2013 – See http://www.ntst.com/compliance/CPT-Code-Changes-For-2013.pdf.  Also, "facility" defined by the American Medical Association to include hospitals (inpatient, outpatient, and emergency department), ambulatory surgical centers (ASCs), and skilled nursing facilities (SNFs). "non-facility" is defined to include all other settings, most notably the offices of a healthcare provider or the residence of the patient.

[4]     Evaluation and Management (commonly designated as "E/M") services require the provider to assess the type and severity of the condition being treated. .

psychotherapy lasting 20 to 30 minutes, is reimbursed at a rate of $59.98 and must be provided at a facility.

85.     In addition to the codes for POS and services provided, only certain providers can be reimbursed by a patient's insurer for services provided.

86.     For instance, Medicare and Medicaid will only reimburse for services provided by approved health care providers. Likewise, private insurers will only reimburse for services provided by physicians within their network.

87.     Ms. Sibley's primary duty was to obtain a Superbill from A Plus' clients and enter in the information to be billed to the insurer.   In theory, the Superbill was supposed to set forth the name of the healthcare provider providing services, the Place of Service (POS), provider of service, diagnosis, charged amount and the CPT code indicating the service provided. In many instances, A Plus would add CPT codes clients failed to provide some or all of the required information on the Superbill.

88.     Pursuant to defendants' "default" protocol, the coding would be added based upon assumed treatments replicating the first visit. Dr. Radomska, for instance, submitted a cover sheet, listing the names of the patients, and a number ("e.g. "3").   Group Exh. A, KS 51, 69[5]. The number next to the patient's name corresponds to a specific CPT code.   "1" corresponds to CPT code 99231, for low-level hospital follow-up care and is generally used when the patient's condition is improving without complication.   "2" corresponds with CPT code 99232, middle-level hospital follow-up care and is generally used when a patient is responding inadequately to treatment and has developed minor complications.   "3" corresponds with CPT code 99233, for

---

[5]        All exhibits are bates numbered and contained in Group Exhibit A, attached hereto.

high-level hospital follow-up care and is generally used when a patient has developed significant complications or significant new symptoms. Notably, Dr. Radomska did not provide the POS, date of service or diagnosis treated.

89.     Defendant Gentile would often fill in, in her own handwriting, entire superbills on behalf of providers, including defendants Handrup, setting forth the CPT code to be billed. Group Exh. A, KS 53-59, 94-95, 97.

90.     The practice of Dr. Sandhu, an employee of defendants Handrup, was to provide A Plus with patient lists and date of service, but he often failed to list CPT codes, POS codes or diagnosis. Defendant Gentile would then make up and insert a billing code, based on the rate of reimbursement. Group Exh. A, KS 60-65, 99, 159.

91.     Defendant Gentile would often instruct Ms. Sibley to change the CPT codes billed based on the insurance of the patient, to maximize reimbursements.  Group Exh. A, KS 68.

92.     Group Exh. A, KS 160-161 are examples of super bills submitted by one physician-client of A Plus, and lacking any indication of services provided, POS or diagnosis. Group Exh. A, KS 162-165 are examples of Defendant Gentile writing in CPT codes to be used without any supporting documentation.

93.     Dr. Hubert Dolezal was a client of the A Plus defendants, and one for whom Relator submitted claims for reimbursement.  Dr. Dolezal's practice was to submit superbills setting forth the names of patients and dates of service, but lacking documentation of services provided, POS or diagnosis.  Group Exh. A, KS 72-81, 83-87.  Defendant Gentile would write in the POS and diagnosis to be billed in order to ensure the highest reimbursement rate.

94. The attached print screens show draft claims created by A Plus medical billers at the instruction of defendants Gentile and Schoewe. Group Exh. A, KS 70-71.

95. Dr. Handrup would often send in superbills listing the patient name and a number or letter code. In addition to the number codes described, *supra*, Dr. Handrup also used "D" to designate a discharge patient, billed using CPT code 99238, and "RD" to designate a new patient, billed using CPT code 90801. Group Exh. A, KS 52. Defendant Gentile would also fill in entire superbills on behalf of providers employed by Handrup & Associates, setting forth the CPT code to be billed without any documentation. Group Exh. A, KS 53-59, 94-95, 97.

96. In her handwriting defendant Gentile set forth billing instructions, including to hold charges to avoid being hit with a Medicare deductible and/or to qualify for Public aid billing. Per her instruction, Ms. Sibley wrote that she was to "change the POS depending on what code I'm billing". Group Exh. A, KS 88-93, 98, 166.

97. During Ms. Sibley's first six months employed by Defendant, she was repeatedly reprimanded by defendant Gentile for billing incorrectly. Ms. Sibley would respond that she was billing as the law provides and based on her experience prior to joining Defendant. Defendant Gentile replied that Ms. Sibley was billing "wrong according to how we bill."

98. In particular, Ms. Sibley would receive Superbills from clients that did not set forth the CPT code or location for service. In these instances, she would be instructed by defendant Gentile to select from one of several CPT codes that billed the highest rate, without confirming that the services were provided as billed, or to alter the POS to ensure the maximum reimbursement.

99. For example in September 2011, Ms. Sibley received a Superbill from Defendant Gentile submitted to A Plus by provider Dr. Dolezal. The Superbill listed patients names on the right-hand side of the spreadsheet and dates the patients were seen in the preceding columns. Seven patients were listed and each was seen eleven times between August 13, 2011, and September 17, 2011. The superbill listed seven patients seen at Danforth House, a Chicago-based nursing home, who purportedly received services from Dr. Dolezal 11 times between August 13, 2011, and September 17, 2011, a total of 77 claims. Group Exh. A, KS 76. Dr. Dolezal failed to provide information regarding the diagnosis treated, the POS, or the CPT code reflecting the services provided. *Id*. No information regarding the patient diagnosis treated, the location where the services were provided, or the CPT code to be used, was provided by Dr. Dolezal.

100. At the top of the spreadsheet submitted by Dr. Dolezal, defendant. Gentile had written that all visits for each patient should be billed using CPT code 90816, indicating that each patient was seen as an inpatient for 20 to 30 minutes. Defendant Gentile also directed Ms. Sibley to delete all other diagnosis other than the mental health diagnosis, in order to ensure reimbursement by Medicare. See Group Exh. A, KS 76.

101. Each patient listed on the spreadsheet submitted by Dr. Dolezal was insured by Medicare.

102. In 2011, CPT code 90816 was reimbursed at a rate of $61.96 when billed using the facility-rate POS 56, corresponding to a Psychiatric Residential Treatment Center, Group Exh. A, KS 21, as opposed to a rate of $58.56 when billed using POS 54 (difference of $3.40).

Group Exh. A, KS 11. Each of the 77 claims documented on Group Exh. A, KS 60 was improperly billed, resulting in overpayments by Medicare of $261.80.

103.    Defendant Gentile repeatedly gave Relator superbills like Group Exh. A, KS 76, in which she wrote in the CPT code, POS code and the diagnosis to provide. Other examples can be found on pages 72 – 81, attached. Defendant Gentile's handwriting is generally found at the top of the page.

104.    At the top of the spreadsheet submitted by Dr. Dolezal, Ms. Gentile had written that all visits for each patient should be billed using CPT code 96152, indicating that each patient received health and behavior intervention services. CPT code 96152 is billed in 15 minute units, with each increment being reimbursed at a rate of $20.36 if performed in a non-facility and $20.00 if performed in a facility, in 2012. Defendant Gentile instructed Ms. Sibley to bill four units for each patient visit and instructed to bill the location as 54, designated in the 4-C system as a non-facility. Defendant Gentile also directed Ms. Sibley to not include psychiatric diagnosis and only include the medical diagnosis in the claims in order to insure reimbursement by Medicare.

105.    In addition to altering CPT and POS codes to ensure higher reimbursement, Defendant Gentile also repeatedly instructed billers to change the CPT codes used to bill for identical services based on how the patient was insured. For example, in Group Exh. A, KS 68 and 78, Defendant Gentile instructed Relator to bill Medicare using CPT code 99308 and Public Aid and commercial insurers using CPT code 90862. All of the patients were seen at Carlton Nursing Home by Dr. Sandhu of Handrup & Associates. CPT code 99308 corresponds to subsequent nursing home care, and in 2012 was reimbursed at a rate of $71.02 by Medicare,

25

while 90862 corresponds to medication management, and in 2012 was reimbursed at the non-facility rate of $62.25. Group Exh. A, KS 16-17. By alternating codes, Defendant Gentile was ordering billers to bill the higher rate for identical services, resulting in overpayments of $8.77 per claim. According to relator, all billers were told to alternate CPT codes based on a patient's insurance provider and reimbursement rates, regardless of the service actually provided.

106. Finally, Defendant Gentile would alter CPT codes after claims were denied, and resubmit them for payment using different CPT codes. Group Exh. A, KS 156 and 159 are screenshots of Defendants' 4-C computer system and show notes entered by Ms. Gentile documenting her alterations to CPT codes in order to have claims that were previously denied, reimbursed. In Group Exh. A, KS 156, she states that APS Billing, a third party distributor of Medicare reimbursements, denied a claim billed as CPT code 90801, and that she rebilled as 90805 in order to receive reimbursement. CPT code 90801 corresponds to psychiatric diagnosis interview, and generally occurs on a patient's first visit. Group Exh. A, KS 156. CPT code 90805 corresponds to a 20 to 30 minute psychiatric office visit, and generally occurs after a patient's first visit. Group Exh. A, KS 11. By billing for a different service in order to ensure receipt of reimbursement, Ms. Gentile fundamentally altered the service upon which the reimbursement was based. This is a false claim.

107. By altering the diagnosis submitted to Medicare, defendants were able to ensure that the claims were, in fact reimbursed, and reimbursed at the higher non-facility rate.

108. On occasion, Superbills would be provided indicating that a patient was seen by a physician outside of the patient's network as proscribed by the patient's insurer. In these instances, Defendant Gentile would instruct Ms. Sibley to input claims as if a different physician,

who was eligible for reimbursement from the patient's insurer, provided the services set forth in the claim.

109.    Schoewe was aware of the practice of changing providers, and instructed Sibley to change providers to ensure reimbursement.

110.    On May 31, 2012, Sibley sent Schoewe an email memorializing a conversation by which Gentile instructed her to bill the provider for a patient as Dr. Theodore Handrup, when the patient actually saw Cynthia Handrup.  Ex. C, SIBLEY PL PROD 296

111.    CMS only reimburses healthcare providers who have been approved to provide service and issued a National Provider Identifier ("NPI").

112.    In one instance, Defendant. Gentile instructed Ms. Sibley "if a provider name doesn't match enter the payment anyway then save it. Then go back and change the provider (phys) then ty [sic] to save it." Group Exh. A, KS 94.

113.    For example, on February 17, 2012, Ms. Gentile spoke with a representative from AGVA insurance who informed her that Mrs. Cynthia Handrup was not in network and thus claims for services provided by her to an AGVA beneficiary would not be reimbursed.  Ms. Gentile immediately altered the healthcare provider information for the patient from Mrs. Handrup to Dr. Theodore Handrup, who was within AGVA's network.  The claim was immediately paid. Group Exh. A, KS 157.

114.    A Plus received the benefit from this false claim.

115.    In another instance, Ms. Gentile submitted claims to UHC Medicare Complete stating that Mrs. Cynthia Handrup was the provider, when in fact, Fabienne Williams, who was not approved to submit claims to CMS, had provided the billed for services to the patient. Group

Exh. A, KS 161. Ms. Sibley is aware that several other billers similarly were told to alter or upcode claims in order to ensure maximum reimbursements. *See also* Exh. C, SIBLEY PL PROD 296 (Email to Schoewe of May 31, 2012 memorializing Sibley's instructions to change providers.)

116.    Schoewe was aware of the widespread submission of bills where inadequate information had been provided and submission of false claims.

117.    As set forth *supra*, in June 21, 2012, Sibley sent an email to Dale Schroeder, an employee of the Handrup Defendants and copied Schoewe.

118.    In this email, Sibley not only informed Schoewe of the problems with documentation, but also she noted that she believed Dale informed her that Dr. Rodomska had not charted since January; therefore, the 90805 code was just being circled.

119.    Schoewe continued the relationship and submission of bills on behalf of the Handrup Defendants after being put on notice that there was a serious problem with the information A Plus was receiving.

120.    Moreover, Schoewe was aware that the information being provided by the providers was inadequate to be able to accurately bill. He knew that information received lacked any description of the service performed, which is necessary to submit a proper claim, however he continued submitting the claims.

**D.    Kickbacks**

121.    Ms. Sibley is aware that physician groups would provide monetary incentives to A Plus to ensure that A Plus altered bills to generate the maximum reimbursements.

122.    The physician groups were aware of the fraudulent billing practices described in Section A, *supra*.

123.    Ms. Sibley was told by defendant Schoewe that her bonus depended on maintaining a certain level of reimbursements.

124.    Ms. Sibley was also told that she could not allow the Handrup account to generate less than $100, 000 per month, or she would not receive a bonus.

125.    One morning in early 2012 Ms. Sibley arrived to work before both Gentile or Schoewe.

126.    The normal routine was that Schoewe would place opened mail on Sibley's desk. Mail would consist of patient payments, correspondence from insurers and other business related mail. However this morning in the mail was a plain white envelope with "Laurie" handwritten on the front.

127.    It was unusual for Sibley to receive an envelope without a post mark or more information on the outside. Sibley opened the envelope and found a check from Handrup & Associates written personally to defendant Gentile. Ms. Sibley realized that this was a personal check for Gentile, not meant for her to open.

128.    Ms. Sibley recognized that this was highly unusual to be in her normal mail pile and resealed the envelope with a glue stick. When Gentile arrived to work later that morning, Ms. Sibley gave her the envelope containing the personal check and Ms. Gentile took it to her desk.

129.     Later, after 1 p.m. when Ms. Sibley was alone in the lunch room, Gentile entered and told Ms. Sibley among other things, "once you take over this account you will be able to get checks like this. Just hang in there."

130.     After Ms. Gentile retired in May 2012, Ms. Sibley repeatedly received complaints from physician groups imploring her to "make up" codes when none were provided on the Superbill and to "bill like Laurie used to."

## C.     Retaliation

131.     Ms. Sibley repeatedly complained to both Defendants Schoewe and Gentile about being asked to bill improperly and advised them she would not do so.

132.     In September 2011, Ms. Sibley approached Defendant. Gentile and told her that she was being asked to enter CPT codes and location codes on behalf of Handrup that were improper. Defendant Gentile told Ms. Sibley that the codes were not improper and to "bill like we do here."

133.     For the next several months, Ms. Sibley routinely approached Defendant Gentile to inform her that the CPT codes being submitted for reimbursement from public and private insurers did not match the Superbills or lacked sufficient information to support the claim.  On every occasion Ms. Sibley was told that she was wrong and to bill the way A Plus bills.  *See supra.*

134.     On or about February 2012, Defendant Schoewe announced that Ms. Gentile would be retiring from day-to-day operations in May 2012, and moving to Arizona.

135.     On or about late February or early March, 2012, Ms. Sibley was invited to a meeting with  Defendants Schoewe, Gentile, and Dr. Theodore and Mrs. Cynthia Handrup, The

purpose of the meeting was to discuss the full transition of primary oversight of the account from Defendant Gentile to Ms. Sibley.

136.    During the meeting Dr. Handrup asked whether Ms. Sibley would be able to ensure that the reimbursement "numbers" stayed up.

137.    Dr. Handrup also stated that he did not want any "red flags" from Medicare, so he hoped that A Plus would continue to bill the way Defendant. Gentile had been.

138.    During the meeting, Defendants Schoewe and Gentile agreed to keep the numbers up and promised to continue billing in the same fashion.

139.    After the meeting, Ms. Sibley approached Defendant Schoewe and informed him that once she took over the account she would not continue to bill improperly.  She asked Defendant Schoewe, "can I trust that you are okay with me billing properly?" Defendant Schoewe stated that he was. In addition, as set forth above, he said he would speak with Handrup.

140.    From March 2012 through July 2012, Ms. Sibley was primarily responsible for submitting claims on behalf of Handrup.  During that time, Ms. Sibley refused to bill claims that lacked sufficient supporting information, and would not submit claims for services that were not provided, would not input location codes when services provided elsewhere, and would not alter healthcare provider codes to ensure insurance coverage.

141.    On or about the end of April 2012, Defendant Schoewe approached Ms. Sibley and asked her why the Handrup account was generating less revenue. Ms. Sibley responded that there was a stack of claims that she could not submit due to lack of sufficient information, thus

31

no reimbursements had been made.  Defendant Schoewe ordered her to get the claims approved.  Ms. Sibley refused.

142.    On or about July 2012, Ms. Sibley was in a car accident and was forced to take three weeks leave from work.  Upon her return in early August 2012 she was summoned by Defendant Schoewe.

143.    Schoewe said that while Sibley was gone A Plus was able to generate more revenue on behalf of Defendant Handrup and asked Ms. Sibley if she would be able to maintain the level of revenue generation.  Ms. Sibley stated that she would not submit illegal claims for services that were provided in the manner documented. Defendant Schoewe then told Ms. Sibley not to return to work.

144.    On or about August 2012, Ms. Sibley filed for unemployment benefits with the Illinois Department of employment Security stating that the reason for her unemployment was termination.

145.    On or about late August 2012, A Plus challenged Ms. Sibley's unemployment claim.  Ms. Sibley provided evidence of her termination and was granted unemployment benefits.

<u>**CLAIMS**</u>

**COUNT I**
**False Claims Act  -  All Defendants**

146.    Relator repeats and realleges each and every allegation contained in paragraphs 1-145 as if fully set forth herein.

147.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended.

148.    By virtue of the acts described above, defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval by the Medicare and Medicaid programs.

149.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements and omitted material facts, to induce the Government to approve and pay such false or fraudulent claims.

150.    The United States, unaware of the falsity or fraudulent nature of the claims that defendants caused, paid and continues to pay for claims that would not be paid but for the defendants' false and fraudulent claims and certifications.

151.    By reason of these payments the United States has been damaged, and continues to be damaged in substantial amounts to be determined at trial.

**WHEREFORE**, Relator prays for judgment against the Defendants, as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

5.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

6.    That Relator recover such other relief as the Court deems just and proper.

33

## COUNT II
### Anti-Kick Back Statute - Defendant Gentile

126.    Relator repeats and realleges each and every allegation contained in paragraphs 1-125 as if fully set forth herein.

127.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended.

128.    By virtue of the acts described above, defendants knowingly made or used, or caused to be made or used prohibited referral and/or kickback arrangements in violation of federal rules and regulations, and are liable for civil monetary damages.

129.    Claims submitted for reimbursement to government payors are *per se* false when submitted pursuant to, or as a result o, prohibited referral and/or kickback arrangements in violation of the Anti-Kickback Statute.

**WHEREFORE**, Relator prays for judgment against the Defendants as follows:

1.  That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.  That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.  That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.  That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

5.  That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

6.  That Relator recover such other relief as the Court deems just and proper.

34

## COUNT III
### False Claims Act – Retaliation
### Defendant A Plus

134.    Ms. Sibley repeats and realleges each and every allegation contained in paragraphs 1 - 133 as if fully set forth herein.

135.    Ms. Sibley took lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

136.    As a result of protesting and bringing defendants' false and fraudulent conduct to light, Ms. Sibley was subjected to retaliation, in the form of termination.

137.    A Plus' conduct in terminating Ms. Sibley in direct response to her refusal to participate in the unlawful conduct is in violation of the False Claims Act, 31 U.S.C. § 3730(h).

138.    Through A Plus' actions in violation of the False Claims Act, 31 U.S.C. § 3730(h), Ms. Sibley has suffered damages including, but not limited to, loss of her job and income, loss of career  opportunities, and humiliation.

**WHEREFORE**, Ms. Sibley respectfully requests that this Court enter judgment against the A Plus as follows:

1. Ms. Sibley be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and other applicable law;

2. Ms. Sibley be awarded the maximum damages allowed pursuant to 31 U.S.C. § 3730(h), including such relief to make her whole for the damages and financial losses suffered, including, but not limited to, two times the amount of back pay, pre- and post-judgment interest, punitive and compensatory damages, and all litigation costs and reasonable attorneys' fees and costs;

3. That this Court award the United States and Ms. Sibley such other and further relief as it deems just and proper.

35

## COUNT IV
### Illinois False Claims Act – All Defendants

139.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 - 138 of this Complaint.

140.    This is a qui tam action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175, *et seq.*

141.    740 ILCS 175/3(a) provides liability for any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

142.    Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, and by virtue of the fact that hundreds of claims were submitted on behalf of physician groups for services that were not provided as billed.

143.    The State of Illinois, by and through the Illinois Medicaid program, and unaware of defendants' conduct, paid the claims submitted by defendants for services purportedly provided.

144.    Compliance with applicable Medicaid and the various other federal and state laws cited herein was an implied and express condition of payment of claims submitted to the State of Illinois in connection with defendants' conduct.

36

145.    Had the State of Illinois, by and through Medicaid, known that claims had been submitted for reimbursement of services that were not provided as billed, it would not have paid the claims submitted by defendants

146.    As a result of defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount in excess of hundreds of thousands of dollars exclusive of interest.

147.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of herself and the State of Illinois.

148.    Relator requests that this Court accept jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of Illinois in the operation of its Medicaid program.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against A Plus:

To the State of Illinois:

a.  Three times the amount of actual damages which the State of Illinois has sustained as a result of A Plus' conduct;

b.  A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which A Plus caused to be presented to the State of Illinois;

c.  Prejudgment interest; and

d.  All costs incurred in bringing this action.

To Relator:

1.  Fifty percent of the proceeds pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

2.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

3.   An award of reasonable attorneys' fees and costs; and

4.   Such further relief as this Court deems equitable and just.

**COUNT V**
**Illinois Insurance Claims Fraud Prevention Act**
**All Defendants**

150.   Ms. Sibley repeats and realleges each and every allegation contained in paragraphs 1 - 148 above as though fully set forth herein.

151.   This action is brought by Relator Kenya Sibley to recover treble damages and civil penalties under 740 ILCS § 92/1 *et seq.*, the Illinois Insurance Claims Fraud Prevention Act.

152.   740 ILCS §92/5(a) provides in relevant part for a civil cause of action against any person who commits the crime of insurance fraud.

153.   Pursuant to 720 ILCS §5/46-1, a person commits the offense of insurance fraud when he or she:  Knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance by an insurance company…

154.   Defendants violated 720 ILCS §5/46-1(a) and committed insurance fraud in that from at least 2011, and continuing through August 2012, they have repeatedly, knowingly and intentionally, presented, or caused to be presented, false claims for payment in connection with medical and psychological healthcare services.

38

155.     The private insurers, unaware of defendants' fraudulent acts, paid many of the claims submitted to them in connection with the fraudulent acts alleged herein.  Had they known of defendants' fraudulent acts they would not have paid the claims.

156.     As a result of defendants' commission of the insurance fraud described herein, the citizens of the State of Illinois have been damaged in amounts yet to be determined.

WHEREFORE, Relator prays for judgment against the defendants as follows:

a.  Enter judgment in her favor and against all defendants;
b.  That this Court enter a temporary restraining order and a permanent injunction pursuant to 740 ILCS §92/5(b) to protect the public and prevent the dissipation of illegal proceeds;
c.  That this Court order that all proceeds of the fraud scheme described herein and received by the defendants  (including their successors and agents) be held in constructive trust for the benefits of the plaintiffs;
d.  For the Relator, Ms. Kenya Sibley, an amount not less than 30% of the proceeds of this action pursuant to 740 ILCS §92/25;
e.  Reimbursement of all expenses Ms. Sibley has incurred in connection with this action;
f.  An award of reasonable attorneys' fees; and
g.  Such other relief as the Court deems just and appropriate.

## **DEMAND FOR A JURY TRIAL**

Ms. Sibley demands a jury trial on all claims alleged herein.

Respectfully submitted,

 /s/ Robin Potter
Attorneys for Plaintiff-Relator

Robin Potter, Esq.,
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Drive, Suite 2600
Chicago, Illinois  60601
(312) 861-1800
robin@potterlaw.org

Jefferey Ogden Katz
Michael Haeberle
The Patterson Law Firm, LLC
1 North LaSalle Street
Suite 2100
Chicago, Illinois 60602
(312) 750-1817
JKatz@pattersonlawfirm.com

39

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing PLAINTIFF-RELATOR'S THIRD AMENDED COMPLAINT served by ECF mail on this 14th day of September, 2015:

/s/    Robin Potter
Robin Potter